*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JONATHAN DEWIGHT HICKERSON,

        Defendant-Appellant.

UNPUBLISHED
June 25, 2025
3:26 PM

No. 369765
Oakland Circuit Court
LC No. 2013-244355-FC

Before: LETICA, P.J., and MURRAY and PATEL, JJ.

PER CURIAM.

Defendant was resentenced to a term of 40 to 60 years for his 2014 jury-trial convictions of first-degree felony murder (felony murder), MCL 750.316(1)(b); assault with intent to murder, MCL 750.83; first-degree home invasion, MCL 750.110a(2); and three counts of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1). Defendant argues the trial court abused its discretion in sentencing him because the trial court failed to properly consider mitigating factors, and the sentence was disproportionate and an unconstitutional de facto life sentence. We remand.

## I. BACKGROUND

In 2014, defendant was sentenced to life in prison without parole for his felony-murder conviction, resulting from the 2012 death of Adriann Contreras during a botched home invasion committed when defendant was 17-years-old. A lengthy appeals process led to our Supreme Court vacating defendant's sentence in 2022, and remanding the case to the trial court for resentencing.[1]

---

[1] See *People v James*, unpublished per curiam opinion of the Court of Appeals, issued January 21, 2016 (Docket Nos. 322890 and 322891), vacated in part by *People v Hickerson*, 503 Mich 912 (2018); and *People v Hickerson (On Remand)*, unpublished per curiam opinion of the Court of Appeals, issued October 8, 2019 (Docket No. 322891), vacated in part by *People v Hickerson*, 510 Mich 1068 (2022).

## A. DEFENDANT'S POSITION

Before his resentencing, defendant filed a 250-page sentencing memorandum, explaining how his childhood was marred by trauma, neglect, and instability. Defendant's mother was 17-years-old when she gave birth to defendant, while defendant's father was 51-years-old. Defendant's parents were addicted to crack, and defendant was often homeless or living in deplorable conditions throughout his childhood. Defendant was bullied and struggled in school, before dropping out in tenth grade. Soon after, defendant began selling drugs to help support his family, and joined the Latin Kings gang for protection. Defendant's first interaction with the criminal justice system soon followed, when defendant was cited for truancy. Defendant was later arrested for stealing a car, resulting in him spending time in Children's Village. After a domestic incident involving his mother and stepfather, defendant was sent to the Wayne County Juvenile Detention Center.

As a result of injuries he sustained during the home invasion, defendant is completely and permanently blind. The sentencing memorandum detailed extensively defendant's effort for rehabilitation during the 10 years he has been incarcerated, including teaching himself braille. Defendant also submitted a comprehensive reentry plan, including housing placements, community support services, and employment options. Defendant submitted numerous letters in support indicating defendant's progress since his incarceration, and reiterating the support waiting for him on release.

At defendant's resentencing hearing, the trial court noted it reviewed defendant's sentencing memorandum and his Presentence Investigative Report (PSIR).[2] In light of the information provided in the PSIR and sentencing memorandum, defense counsel argued for the statutory minimum sentence of 25 years to be imposed. Defense counsel argued that while defendant's report at the time of his original *Miller*[3] hearing stated defendant had "limited potential for rehabilitation," the evidence since indicated otherwise. According to defense counsel, the trial court "has to look at [defendant] now through the lens of his youth, look at the aims of sentencing . . . ." Defense counsel described defendant's deep and ongoing remorse for his actions, and cited the numerous support letters discussing how often defendant expressed "his deep regret."

---

[2] The PSIR reiterated much of defendant's childhood, and noted defendant was diagnosed with epilepsy and asthma as a child and Attention Deficit Disorder and Bipolar Disorder as a teen. Defendant accrued 18 prison misconducts from July 24, 2014, until February 8, 2022, for: (1) assault and battery–prisoner; (2) absent without leave; (3) interference with administrative rules; (4) malicious destruction of property; (5) insolence; (6) minor misconduct; (7) unauthorized occupation of a cell or room; and (8) disobeying a direct order. As a result, defendant has lost privileges 15 times and received "top lock" twice. The PSIR noted defendant learned the use of Braille, his employment despite his blindness, his multiple certificates awarded, his work on his GED, and his reentry program plan. It also contained statements by defendant as to why the crime occurred, and his troubled upbringing.

[3] *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012).

Defendant spoke on his own behalf, expressing remorse for his actions and explaining he thought about his actions, Adriann, and Adriann's family, every day. Defendant described how he was "lost" before prison, and how he joined the Prisoner Creative Arts Program. Defendant explained his participation in the poetry workshop, and how he had written poems about his experiences, and read some of his poetry for the trial court.

## B. THE PROSECUTION'S POSITION

In opposition, the prosecution requested the trial court to sentence defendant at the top of the statutorily permissible minimum range. Part of the prosecution's position was based upon the harm defendant's actions had, and still have, on the victim's family.[4] The victim's brother, who was at the scene of the crime but survived, spoke at the resentencing and explained how the murder continues to haunt the entire family:

> So, growing up me and my brothers, Adrienne [sic] and David, were inseparable. Losing him hurt my family in ways I wouldn't wish on my worst enemy. It's a wound that still to this day hurts. I apologize I'm not much of a public speaker. We all have the right to live. My brother's right to live was taken from him for greed. It's been 11 years and not a day goes by that I don't think about what happened that night. I wake up to a pin drop at night. I have dreams about that night all the time. It's been a long bumpy road without my brother. He had a lot of people that loved him. He has a lot of people that miss him. Everybody says there's nobody like so and so when they die but there really was nobody quite like Adrienne [sic]. He could come and make any situation bearable no matter how uncomfortable it was. Even if you were mad at him, it was hard to stay mad at him long. I wish I could have just one more conversation with him.

> He has two beautiful kids that he'll never get to watch grow up. A son that looks just like him that he never got to meet, [AJ], and his beautiful sister [A]. They both have to grow up and explain to people over and over why their daddy isn't around. He missed everything. Their first words, their first steps, daddy daughter dances, being able to teach his son to go fishing or play catch.

> I remember every little detail that night. The scariest moment of my life till this day. I still wake up from the dreams of gunshots and the voice, "Anybody I see moving is getting shot," plays over and over. The image of a masked gunman at my bedroom door, bullets flying past my head thinking my brother David was hit. Don't shoot, and then more shots flying by my head. He tried to kill us all. He deserves to be where he's at. During the allocution statements, he said I deserved to be tortured and now he wants freedom. He doesn't ever deserve to be free.

> The tattoos on his face show that he's proud of what he did. It's a badge of honor. There's no rehabilitation after 11 years when you're proud of what you did. So, to

---

[4] The Michigan Constitution expressly affords the right of victims "to make a statement to the court at sentencing." Mich Const 1963, art 1, § 24.

let this man out of prison would be an injustice to my brother, his kids, and my entire family.  He took the life of an innocent, hardworking, honest man.  He was a father, a brother, a son, a friend; permanently scarred countless others, caused PTSD and survivor's guilt.  I think constantly what if.  What if I was a little faster would my brother still be alive?  What would he be like now?  I miss my brother.  The pain doesn't go away.  I thought by now it would, but it don't.

Next to address the court was the victim's wife Megan, who was pregnant with their second child when her husband was murdered by defendant.  She expressed to the court why she (and her two children) felt defendant deserved a lengthy sentence:

My name is Meghan [sic] Contreas [sic].  I'm the wife of Adrienne [sic] Contreas [sic].  I stand before you today to ensure that justice will prevail.  It has been 4,098 days since this monster committed this senseless, sick crime then not only turned my life upside down but our children's lives as well.  I don't stand before you to think why the obvious reason why this monster does not deserve a lower sentence or even a chance of living in the free world, instead I'm going to tell you what the last 11 years has been for our children and I.  We have two beautiful children, [A] who is our oldest, and our son, AJ[.]  Adrienne [sic] had only had the experience for six months when he passed.  He said that when our daughter was born, he looked into her eyes, she touched his soul.  Our daughter was his world and he adored her so much. She is 11 years old now and she has faced many challenges due to her father's murder.  Our daughter in her own words wanted to explain what it's been like for her.  I quote, "To whoever is listening, my daddy will never be able to take me to daddy-daughter dances, see me at prom, or graduation.  He will never be able to walk me down the aisle at my wedding.  For a girl my age watching other girls and their fathers have permanently broken my heart.  I love my daddy.  He is my hero, so please make sure he gets the justice he deserves."

Now our son who is 10 years old never got a chance to meet his father.  Adrienne [sic] was murdered when I was 11 weeks pregnant with our son.  He never got to hear his son's heartbeat.  Our son also in his own words wanted to explain what it's been like for him. I quote, "I never got to meet my dad.  My mom says that I look like him and that I'm funny just like he was.  I wish I could have gotten a chance to meet him and have father-like experiences.  Please, for my sister, my mom, my dad, and I, don't let our family down. My dad deserves justice."

For the last 11 years, my husband's death has hardened me every day of my life.  Losing Adrienne [sic] has changed me forever.  I can't begin to express the challenges that this night left me with.  I dream about Adrienne [sic] never being murdered and ripped from his children and I wish that he was here to experience the milestones in his children's life.  I dream about us growing old together, about him opening up his own restaurant like he always talked about for 11 years in countless therapy sessions.  I only have one question: why?  Why did this monster feel that he had the right to take Adrienne's [sic] life?  I ask that you listen to the pain in our children's hearts and make the right decision which is not to lower this monster's sentence or a chance of living a free life.  He took a father away from his

children. He deserves to sit and be reminded every day why he is there and the trauma that is permanently left on our children and I.

Addressing defendant's age at the time of the murder, the prosecution explained that the offense "wasn't merely a youthful indiscretion," because defendant made the plan, made the decision to go inside knowing people were home, threatened Adriann with an AR-15 rifle, started shooting when confronted, "faked giving up" after being chased out of the residence, and then started shooting again. The prosecution described defendant's actions as "calculated," explaining "these were cold shootings and killing." The prosecution asserted defendant was already given consideration when they did not seek a sentence of life without parole, and requested that the trial court sentence defendant to the top of the statutory minimum.

Several times during the hearing the trial court noted that it had read defendant's sentencing memorandum, as well as the PSIR. In imposing defendant's sentence, the court explained that "based on all the information it's received and reviewed by defense and the prosecution that this sentence is proportional to the crimes that have been committed."

## II. ANALYSIS

On appeal, defendant first argues he is entitled to resentencing because the trial court did not analyze defendant's youth as a mitigating factor, did not apply the *Miller* factors, and used the crime as an aggravating factor when sentencing defendant to a 40-year minimum sentence.

## A. REASONS ON THE RECORD

"Sentencing issues are reviewed by this Court for an abuse of discretion by the trial court." *People v Sabin (On Second Remand)*, 242 Mich App 656, 660-661; 620 NW2d 19 (2000). Sentencing decisions must be "based on the principle of proportionality." *People v Posey*, 512 Mich 317, 352; 1 NW3d 101 (2023) (opinion by BOLDEN, J.). This requires " 'sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *People v Steanhouse*, 500 Mich 453, 474; 902 NW2d 327 (2017), quoting *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990). "[A]ppellate courts must review all sentences for reasonableness, which requires the reviewing court to consider whether the sentence is proportionate to the seriousness of the matter." *Posey*, 512 Mich at 352. "A sentence is unreasonable—and therefore an abuse of discretion—if the trial court failed to adhere to the principle of proportionality in imposing its sentence on a defendant." *People v Lampe*, 327 Mich App 104, 125; 933 NW2d 314 (2019).

Defendant was sentenced under MCL 769.25. Under MCL 769.25(2)(b), the prosecution may move to sentence a defendant convicted of felony murder committed while the defendant was a juvenile to life without parole. Under the statute, if the prosecution does not move for a sentence of life without parole, "the court shall sentence the individual to a term of imprisonment for which the maximum term shall be not less than 60 years and the minimum term shall be not less than 25 years or more than 40 years." MCL 769.25(9).

"Where the Legislature has assigned a range of sentencing outcomes for any given conviction, the trial court has authority to sentence a defendant within that range." *People v Boykin*, 510 Mich 171, 183; 987 NW2d 58 (2022). "Within that range, the sentence should be

tailored to the particular circumstances of the case and offender." *Id*. When determining an appropriate sentence, the trial court should consider "the reformation of the offender, the protection of society, the discipline of the offender, and the deterrence of others from committing the same offense." *Id*.; see also *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972). Further, "when imposing a term-of-years sentence on a juvenile defendant . . . consideration of youth and its attendant circumstances is . . . required by this state's sentencing jurisprudence." *Boykin*, 510 Mich at 188 (citation omitted).

The Supreme Court in *Miller* identified the mitigating factors of youth a sentencing court should consider as:

> (1) the juvenile's "chronological age and its hallmark features–among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the juvenile's family and home environment—"from which he cannot usually extricate himself—no matter how brutal or dysfunctional"; (3) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; (4) "the incompetencies of youth," which affect whether the juvenile might have been charged with and convicted of a lesser crime, for example, because the juvenile was unable to deal with law enforcement or prosecutors or because the juvenile did not have the capacity to assist their attorney in their own defense; and (5) the juvenile's "possibility of rehabilitation." [*People v Taylor*, 510 Mich 112, 126; 987 NW2d 132 (2022), quoting *Miller v Alabama*, 567 US 460, 477-478; 132 S Ct 2455; 183 L Ed 2d 407 (2012).]

We reject defendant's argument that the trial court did not properly consider defendant's youth as a mitigating factor. Indeed, the argument is contrary to the dictates of both the United States and Michigan Supreme Courts, which have both unequivocally stated that a court is *not* required to articulate specific factors regarding the consideration of youth on the record. See *Jones v Mississippi*, 593 US 98, 114; 141 S Ct 1307; 209 L Ed 2d 390 (2021); *Boykin*, 510 Mich at 193-194 (trial courts sentencing juvenile defendants are required to consider a defendant's youth and treat it as a mitigating factor, but "this consideration need not be articulated on the record"); *People v Copeland*, ___ Mich App ___, ___; ___ NW3d ___, (2024) (Docket No. 363925); slip op at 3-4 ("*Boykin* rejected the idea that trial courts sentencing juvenile defendants are required to articulate " 'specific factors on the record.' ") (citation omitted). A court considers the mitigating factors of youth when such information is provided to it, as the *Jones* Court explained:

> *First*, and most fundamentally, an on-the-record sentencing explanation is not necessary to ensure that a sentencer considers a defendant's youth. Jones's argument to the contrary rests on the assumption that meaningful daylight exists between (i) a sentencer's discretion to consider youth, and (ii) the sentencer's actual consideration of youth. But if the sentencer has discretion to consider the defendant's youth, the sentencer necessarily *will* consider the defendant's youth, especially if defense counsel advances an argument based on the defendant's youth. Faced with a convicted murderer who was under 18 at the time of the offense and with defense arguments focused on the defendant's youth, it would be all but

-6-

impossible for a sentencer to avoid considering that mitigating factor. [*Jones*, 593 US at 114].

That is precisely what occurred here. Defense counsel provided the court with a comprehensive sentencing memorandum that covered all aspects of defendant's life, which included many significant difficulties with family life, school, and early criminal occurrences. Similarly, the PSIR contained much the same information, and both defendant and his counsel reiterated this information prior to sentencing. And, as noted, the court repeatedly noted that it had read the information in both documents. Under *King* and *Boykin*, the trial court did consider the attributes of youth as argued by defendant.

Of course there remains a "general requirement that a trial court must adequately explain its sentence on the record in order to facilitate appellate review." *Boykin*, 510 Mich at 193-194; see also *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015) ("[S]entencing courts must justify the sentence imposed in order to facilitate appellate review."). As noted, the trial court acknowledged it reviewed defendant's materials and his PSIR, and indicated the case was on remand because of *People v Taylor*; 510 Mich 112; 987 NW2d 132 (2022). However, the only explicit statement made by the trial court regarding its reasoning for sentencing was: "[T]he [c]ourt does feel that based on all the information it's received and reviewed by defense and the prosecution that this sentence is proportional to the crimes that have been committed." The trial court offered no explanation as to how defendant's sentence was proportionate to him individually or how it met any of the goals of sentencing. See *Steanhouse*, 500 Mich at 459-460; *Snow*, 386 Mich at 592. And even though defendant's sentence was within the parameters of MCL 769.25(9), and is presumed proportionate on appeal, we have no explanation—other than that the trial court determined the sentence to be "proportional"—for why this was a sentence proportional to the crime and the offender. So, even though "there is no authority that imposes a higher standard of articulation regarding youth," there is still a "general requirement that a trial court must adequately explain its sentence on the record in order to facilitate appellate review." *Boykin*, 510 Mich at 194. Here, on remand, the trial court must explain its sentence so that we can determine whether the sentence constituted an abuse of discretion.

## B. DE FACTO LIFE SENTENCE

Defendant next argues his sentence is an unconstitutional de facto life sentence.

We first note that while there is no preservation requirement to challenge the proportionality of a sentence on appeal, *People v Walden*, 319 Mich App 344, 350; 901 NW2d 142 (2017), "[t]o preserve a claim that the defendant's sentences were unconstitutionally cruel or unusual, the defendant must raise the claim in the trial court," *People v Burkett*, 337 Mich App 631, 635; 976 NW2d 864 (2021). Defendant did not object to his sentence in the trial court on constitutional grounds. As such, the issue is unpreserved. See *id*.

"This Court generally reviews constitutional questions de novo." *Burkett*, 337 Mich App at 635 (quotation marks and citation omitted). However, this Court reviews "unpreserved constitutional issues for plain error affecting substantial rights." *Id.* (quotation marks and citation omitted). "To establish entitlement to relief under plain-error review, the defendant must establish that an error occurred, that the error was plain, i.e., clear or obvious, and that the plain error affected

substantial rights." *Lockridge*, 498 Mich at 392-393. Showing an error affected substantial rights "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower-court proceedings." *Id.* at 393.

Defendant argues his sentence is unconstitutional because it is the "functional equivalent of a sentence of life in prison." Defendant was sentenced under MCL 769.25, which provides if the prosecution does not move for a sentence of life without parole, "the court shall sentence the individual to a term of imprisonment for which the maximum term shall be not less than 60 years and the minimum term shall be not less than 25 years or more than 40 years." MCL 769.25(9). "Statutes are presumed to be constitutional, and the courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Burkett*, 337 Mich App at 637 (quotation marks and citation omitted). "A party challenging the constitutionality of a statute has the burden of proving its invalidity." *People v Jarrell*, 344 Mich App 464, 482; 1 NW3d 359 (2022). A constitutional challenge can be brought facially or as-applied. *Id.* Here, defendant brings an as-applied challenge because he "considers the specific application of a facially valid law to individual facts." *Id.* (quotation marks and citation omitted). As such, this Court analyzes the statute "as-applied" to defendant's particular case. *Crego v Coleman*, 463 Mich 248, 269; 615 NW2d 218 (2000).

"The Michigan Constitution prohibits cruel *or* unusual punishment, whereas the United States Constitution prohibits cruel *and* unusual punishment. If a punishment passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011) (quotation marks and citations omitted). The prohibition against cruel or unusual punishment under the Michigan Constitution includes a prohibition on grossly disproportionate sentences. *Id.* In determining whether a punishment is grossly disproportionate, courts consider:

> (1) the harshness of the penalty compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed for other offenses in Michigan, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the goal of rehabilitation. [*Jarrell*, 344 Mich App at 484 (quotation marks and citations omitted).]

"Legislatively mandated sentences are presumptively proportional and presumptively valid." *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011). "To overcome the presumption, [a defendant must] show that there was something unusual about the circumstances of his case that made the sentence disproportionate." *People v McFarlane*, 325 Mich App 507, 538; 926 NW2d 339 (2018). As defendant's sentence was legislatively mandated under MCL 769.25, he must present unusual circumstances rendering his presumptively proportionate sentence disproportionate. See *Burkett*, 337 Mich App at 637.

On appeal, defendant does not identify any unusual circumstances which would make his sentence disproportionate. See, e.g., *People v Davis*, 250 Mich App 357, 369-370; 649 NW2d 94 (2002) (holding that a strong family background, prior work history, and no prior related offenses were not enough to overcome the presumption of proportionality). Rather, defendant argues that

his sentence is disproportionate when compared to other sentences under MCL 769.25[5], disproportionate to sentences imposed in other jurisdictions, and does not serve the goal of rehabilitation. In rejecting this position, we first note that MCL 769.25(9) provides a sentencing range minimum from 25 to 40 years, and as such, a minimum sentence under the statute is not "unusual," but presumptively proportionate. See *Burkett*, 337 Mich App at 637; *Brown*, 294 Mich App at 390. Second, as defendant's appellate brief explicitly admits: "[N]o jurisdiction that has fixed a maximum parole eligibility for juvenile offenders [convicted of *first-degree murder*] requires juvenile offenders to serve more than 40 years before becoming eligible for parole." MCL 769.25 is in accordance with defendant's statement. Finally, defendant has not articulated why his rehabilitation in prison is sufficiently unusual to overcome the presumption of proportionality.

Defendant argues that the trial court imposed a "de facto" life sentence on him because his sentence will make him eligible for parole at age 59, while the average life expectancy of juveniles sentenced to serve life without parole is 50.6 years of age, meaning "statistically," defendant will die before seeing the parole board.[6] Importantly, defendant was not sentenced to life without parole, and as such, the burden to impose a life without parole sentence is not relevant to defendant's case. Nor does defendant identify any authority requiring him to be paroled before a specific age, and the speculative possibility that defendant might die before becoming eligible for parole is not an unusual circumstance amounting to plain error affecting his substantial rights. See *Lockridge*, 498 Mich at 392-393. And assuming that the life expectancy is 50.6 years, some juvenile prisoners do live beyond that "average" life expectancy. Compare *People v Eads*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 357332); slip op at 11-12 (court held that defendant, sentenced to 50-75 years, was effectively serving a de facto life sentence because defendant would likely never be eligible for parole), with *People v Nard*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 369185); slip op at 5-6 (defendant was convicted of murder at age 17, and was paroled at age 60). Because defendant has not established the existence of any unusual circumstances to rebut the presumptive proportionality of his sentence, defendant has failed to establish plain error.

Because the trial court did not adequately explain its reasons for this sentence, the matter is remanded for it to do so. We retain jurisdiction.

/s/ Anica Letica
/s/ Christopher M. Murray
/s/ Sima G. Patel

---

[5] In doing so, defendant only cites to broadcast news or newspaper websites, not any opinions, orders, or judgments.

[6] In making this argument defendant relies on two sources, both from groups advocating for lesser prison sentences for those convicted of murder under the age of 18.

# Court of Appeals, State of Michigan

# ORDER

PEOPLE OF MI V JONATHAN DEWIGHT HICKERSON

Docket No.  369765

LC No.  2013-244355-FC

Anica Letica
Presiding Judge

Christopher M. Murray

Sima G. Patel
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court.  We retain jurisdiction.

Proceedings on remand in this matter shall commence within 35 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. As stated in the accompanying opinion, although the trial court was not required to articulate its findings regarding the "*Miller*" factors, *People v Boykin*, 510 Mich 171, 190; 987 NW2d 58 (2022), it was still obligated to provide some explanation to justify its sentence in order to facilitate appellate review.  See *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015) ("[S]entencing courts must justify the sentence imposed in order to facilitate appellate review.").  Because the trial court did not adequately explain its reasons for this sentence, the matter is remanded for the trial court to do so.  The proceedings on remand are limited to this issue.

The parties shall promptly file with this Court a copy of all papers filed on remand.  Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

_Anica Letica_
Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

June 25, 2025
Date

Chief Clerk